All right, Mr. Irwin, you reserve two minutes for rebuttal, and you can begin whenever you're ready. Good morning, I'm Dan Irwin, Assistant Federal Defender from Connecticut. I'm joined by Rod Hendricks from our office. I plan to address two issues today here on behalf of Chris Poller. The first is the general public use dimension of Kelo or Kylo, and the second is more general discussion of the scope of Kelo's holding. The fundamental problem here is that the district court erred when it concluded that the penetration of an otherwise imperceptible barrier in my client's car with an atypical use of a digital camera present in all smartphones these days, not in the general public's cognizance, did not violate his reason. I just want you to put the general public use issue aside for a moment. I know that was referenced in Kylo, but let's look at it at a more basic level with respect to whether or not there was a reasonable expectation of privacy. First of all, courts have unanimously concluded that the use of a flashlight to look into a car is not problematic, is not a search, just because you use a flashlight, right? So here, they're using an iPhone instead of a flashlight, right? Correct. So why should that make a difference in this situation? They're still using their eyes. They're just enhancing their ability to use their eyes. Instead of using a flashlight, they're using an iPhone. Why should that make a constitutional difference? Because flashlights and iPhone cameras in 2022 are an apples to oranges comparison. We have been aware of the functions of flashlights since the days of Thomas Edison and arguably the caveman days. But even if your client doesn't know that the iPhone has this capability, he certainly knows, well, first of all, in the Connecticut law, it can't be completely opaque. It has to be 35%, right? Correct. Okay. So someone knows right away that these tinted windows are not going to prevent somebody, a diligent police officer or an inquisitive passerby, which is the standard, from peeking into the car and seeing at least certain things. You would agree with that. In fact, I think you said in your brief on page 11 that some light could still pass through his windows as required by law, right? Correct. So how could someone have a reasonable expectation of privacy in the contents of that open area of their car when they know that the tinted windows are going to allow somebody who's inquisitive or a diligent police officer to see some things in the car? There was no finding nor contention in this case that the tinted windows were illegal or didn't control. No, no, I'm not saying they were illegal. I'm saying that to be legal, they have to allow someone to at least see some things in the car, right? Correct. But I think if you watch the exhibits that were clearly admitted, the pictures speak a thousand words. They show that the police were not able to perceive the gun and the drugs, but for this use of the iPhone. Wait a minute. I thought the judge found that it was clear from the video that, as I recall here, one of the detectives was able to see inside the car without the assistance of an iPhone by cupping his hands around his eyes and looking through the windshield. Do you agree with that? Did he cup his hands around his eyes? Yes. And did he see through the windshield? That's what Judge Meyer found. And didn't he start narrating in the video what he saw? Correct. So I guess why are we even talking about this iPhone if the police officer was able to and did in fact look through the windshield and see all this with the naked eye? Are you just complaining that he also saw these things through the side window? He saw it first through the iPhone. And if the officer has to cup his eyes and virtually, I don't want to dramatize things and say he climbed on the car, but he was clearly leaning against it in a highly unusual manner than he is making contact. How highly unusual is that? What does that mean? I don't understand what's so unusual about going like this. I have to say you're backlit right now. I have this problem when I sit here because the windows are behind you. So you're sort of backlit. And I could sometimes want to cup my hands so that I can see you more clearly. That's not sort of this technological marvel that I'm engaging in, is it? No, but you're looking at me across a public room in a public space. You're not leaning against a car. Well, the car is parked in a public space and he's totally allowed to look at it, right? It is. But if a person not in a uniform was doing that, it might be the basis for a Terry stop because it's an unusual apprehension of into a public space. Wait, wait, what? It would appear to a person that if it would appear to a passerby, not in law enforcement, that if somebody not in uniform, not a police officer was looking into a car in that way that they were casing the vehicle. That the police might think that the person is thinking about stealing something from the car? Correct. Correct. I don't understand how that's relevant. I think that that goes to whether they're trespassing on the car at that point. Um, what, and Judge Meyer? I'm sorry, what is, what is the link? Just cause you're bringing up a Terry stop, I'm, I'm missing the logical connection between your suggestion that if a passerby were doing something that a police officer is allowed to do, it might look suspicious. How is that? Don't police do things all the time that if a private citizen were doing, it might look suspicious. What does that got to do with whether the, what the police officer is doing is allowed under the fourth amendment because he is allowed to do it. And he's not trying to break in the car. I don't get that. The standard is that if a member of the public is permitted to do something, then the police are, well, he is a passerby is permitted to look in the car. Now, police officer may think that he's doing something beyond what's permitted that he's then going to break into the car. Correct. But there's no law against looking in other people's cars, right? There's not, but I think that, well, so I'm not seeing the connection. If you can see that there's no problem with the officer cupping his eyes and looking, there's no problem with looking, using a flashlight to look in the car and see the gun. What's your argument about why all of a sudden doing it, doing the same sort of investigation with an iPhone raises constitutional problems? To just conclude my answer to Judge Mardini. No, no, I'm good. You can go ahead with Judge Parker. You can answer him after you finish with me. That's not the strongest, I was just gonna say, that's not the strongest part of our argument. Do me first, then you can go to my father. Okay, I apologize. Because the flashlight has been around for a century. The telescope has been around for five centuries. The candle's been around for five centuries, so what? Correct, but the the Kylo Court didn't even contemplate the future in which, the Kylo Court did not even contemplate the future in which we now live, when it was deciding that question. If you look at footnote three, it's talking about... Why does that make any difference? I mean, the iPhone is not an idea, the iPhone is a fact, and there are probably more iPhones in circulation now than flashlights. Correct, and they have innumerable uses, ancillary uses, that are not foreseeable to the public. I don't think that the public... What's the feature that the iPhone, which I dare say everybody in this courtroom has, that makes it constitutionally objectionable to users? It's the atypical use. It's not atypical. Everybody in this courtroom has an iPhone. To hold it up to a window that, or a curtain, and see through it in a way that's not known to the general public. It's got features that are designed to do this. Everybody in this room, when they, in this courtroom, when they got their iPhone, paid for those features and has them in their pocket. I don't think anybody knew that they were paying for, or that a third party rather, was paying for the ability to look through... If you look at it from the other angle, which is whether or not there's a reasonable expectation of privacy. Just going back to Judge Parker's question, if someone knows you can cup your hands and look into the car and see at least certain items, and if you cup your hands over your eyes and you shine a flashlight in, you can see even more items. The fact that whether your client or the general public knows you can use an iPhone for this additional purpose, the expectation of privacy is gone. Yes, there may be some other technology they can use to further enhance it, but at that point, how could someone who has a car have any reasonable expectation of privacy knowing those other things already? That's the key. No, I understand the key, and I'm not claiming it's an easy case. I'm sorry. Yeah, go ahead. It's an easy case, but we have had centuries to acclimate society to these rudimentary enhancers, the flashlight and the telescope. If our phones update tonight and change the level of privacy that we have amongst third parties... It doesn't change the level of privacy. It's just that the person may not have realized they could get a really good look at what's in the car if they use the phone, and I just don't see how that could change the constitutional analysis. But in any event, we know the argument, so we'll let the government go, and you have your two minutes for rebuttal. Thanks, Mr. Irwin. Good morning, Your Honors, and may it please the Court. Catherine Boyles from the District of Connecticut on behalf of the United States. This Court should affirm the District Court's denial of the motion to suppress below and further affirm the District Court's entry of judgment in this case. First, the defendant had no reasonable expectation of privacy on the front seat of his car as it was parked on a public street under either an analysis under Katz or under Kylo. Second, law enforcement did not commit a trespassory search upon the defendant's car before first obtaining a warrant to search that car after having towed that car back to the police station. Accordingly, the District Court's judgment should be affirmed. Turning to the first issue, the defendant's car was indisputably parked on a public street where officers could lawfully stand and view the inside contents of the car. Second, under Texas v. Brown, Cirolo, and Dow Chemical, this is straightforwardly not a search because a typical and in general use technology was used. I mean, I want to focus on that. I'm a little concerned of boiling down this test to the general public use, which was one line where in Judge Scalia's decisions is at least where something's not in general public use. But let's just take Kylo for example. If for whatever reason, phones suddenly had thermal imaging capability that Kylo said was a search, right? That people had that. Or even something that's just emanating heat. Let's assume you could do infrared searches of homes with an iPhone. Do you think Justice Scalia, do you think the Supreme Court would say there Kylo is gone? Like then the police can use phones or other technology, thermal imaging to look at someone's home and see everything outlined in someone's home? Do you really think that that's what it comes down to? Your Honor, I don't think that this court needs to go that far in deciding this case. Certainly there are- Because Justice Scalia suggested that you look at the founding, what the person's expectation was. He says, this assures preservation of the degree of privacy against government that existed when the Fourth Amendment was adopted. So that at least suggests that at least with respect to the home, that even if technology changes, the police are not going to be able to just do whatever they want to look inside a person's home, right? Yes, Your Honor. And two responses to that. So first of all, in your question, there is an important difference in the fact that this technology is being used on a public street versus being directed at a home. And I think the- Right, so we can distinguish Kylo on the fact that this is a car, not a home. Kylo actually made that distinction. The home is different. Yes, the home is different. And we can make a distinction because in Kylo, the thermal imaging was not being used to enhance like a flashlight would the senses of a police officer. It was something that no human could do without the technology. That's a big difference, right? Yes, Your Honor. And I think this court could have decided this case, even setting Kylo aside, this case could have been decided on the existing case law under Katz, Texas v. Brown, Cirolo, and Dow Chemical. Because if we decided it under general use, there's some problematic issues, especially this one actually. I mean, there's already a debate, for example, in the case involving Jardines, involving a dog. There was a back and forth between Justice Kagan and Justice Alito. Justice Kagan said it's a search because trained detection dogs are not in general public use. And Justice Alito said, well, dogs were ubiquitous at the founding. Therefore, this is not a search. So if you reduce it to general use, you can get to some very complicated questions. And here, as Mr. Irwin pointed out, even though iPhones are in general public use, people don't know that they even have this capability. In fact, in the audio, the police officers, you can hear them saying, wow, I didn't know this could do this. One officer knew it and the other officers didn't. So you get into a definition of do people have to generally know that this is available or not? So there's some pretty complicated issues, right? Yes, Your Honor. I agree that there are complicated issues and this is why the Fourth Amendment is such a fertile and interesting ground for debate. This is not a debatable case. This is not close. And as I said, or as I was beginning to say earlier, this case could have been decided irrespective of Kylo, irrespective of the general public use exception because we have the case law from centuries ago at this point that flashlights, marine glass, binoculars, these kinds of eyesight, specifically eyesight enhancing technologies, are completely constitutional. And that is, I don't think that's particularly controversial. So here the court could decide this case just by saying the camera that was used in this case, yes, it's housed in an iPhone, but that is squarely on point and squarely decided by the preexisting case law about flashlights, cameras, binoculars being used. And those those uses not being a search, particularly where they're deployed from a lawful public vantage point of the law enforcement officers. Why do we have to grapple with this technology question at all if officer number one could stand on the street and look into the car and see the guns and whatever? I think part of that is in light of the district court Judge Meyers choice of sort of which arguments he followed and which he decided to write his opinion based on. I agree with you that this case could be decided purely on the question of whether or not the officer who's cupping his hands and using his flashlight to look inside the car. That officer's viewpoint and to Judge Bianco's earlier point, that proof that there is no reasonable expectation of privacy because an officer can do this without the iPhone could decide and end the case. But we're arguing in part on the Kyla question because that is how it was framed up in the district court and how ultimately decided. Can I ask a factual question because it wasn't entirely clear to me. The officer who cupped his hands and looked through the windshield, was that tinted in the same way that the side windows were? I don't believe so, your honor. We didn't have factual finding in the district court on precisely what the tint was on the side windows versus the windshield. I do know that under Connecticut law, the requirements for a front windshield and the side windows are different. So assuming for the sake of argument that the defendant had tinted his windows to the max, but the max legal limit, I would hazard a guess that they were different, though I'm not 100% certain about that. And do you think it matters much? I guess your adversary suggests, well, he looked first through the side windows, which were tinted, and therefore there was some enhancement needed for him to see through them. And that is what led him to then look in, let's call it an arguably more legal way or less troublesome under the fourth amendment way through the windshield. So we're sort of, I don't know if that's sort of a fruit of the poisonous tree type of an argument that if he hadn't violated the fourth amendment by looking through the tinted windows, he never would have looked through the windshield. How do you respond to that? Well, first of all, there were multiple officers that were looking through the windows in a variety of ways, both using the cell phone, the flashlight, as well as the naked eye. I don't think that it's a fruit of the poisonous tree. I think it's actually probably the inverse of that because rather than one search leading to the next or one purported search leading to the next, you had multiple officers that were attempting to look inside this car. Is it clear that the windshield was not tinted? Is that clear from the record or not? No, it's not clear from the record. Let me just ask you about the trespass issue for a moment. Yes, Your Honor. I know you have an argument in your brief that it's not a trespass, but since Jones, there's some disagreement over how much contact can be a trespass or not. In Richmond, the Fifth Circuit said tapping a tire is a trespass. In Taylor, the Sixth Circuit said chalking a car tire is a trespass. So I guess my question to you is, do we need to address that issue if in fact under Hudson v. Michigan and our case in Pabon, if it was not the but-for cause of them being able to view what they viewed in the car, it can't possibly be a basis for suppression. Isn't that... I agree with you that the court doesn't need to reach that question. I would also point the court to the cases that we've cited in our brief regarding the dog sniffs and the incidental touching of a car as the dog is conducting its search around the perimeter of the car. I think that's a really instructive set of cases and I realize it's only persuasive authority for this court because... I know, but I think some courts are conflating whether it's a trespass and whether it's a but-for cause or not and should be suppressed. In other words, just because it's incidental, it could still be a trespass and be incidental, at least under some case law. But the question is, whether it's incidental or not does not necessarily tell you whether it's trespass or not, but certainly the but-for cause rule would take all of that out of the equation if we concluded that the officer could have seen exactly the same thing without weaning his hand on the car, right? Yes, your honor. So the incidentality, the reason that that's significant is that's the second prong of not whether or not determining whether or not there's been a trespass, but whether or not there has been a trespassory search. So here the district court concluded that there actually had been a trespass as a factual matter. There had been physical contact. Now we have arguments against that, but that there was physical contact, but it was not for the purpose of collecting the evidence, and it ultimately was not a but-for cause of being able to collect this visual inspection of the contents of the car. So those dog sniff cases I think are helpful because they distinguish between dog sniffs where the canine actually put either a nose or its front paws through a windshield, crossed the plane of the car, and actually entered the car. Those were considered searches by the district courts that have considered this issue. But whereas here, the search or rather the inspection by the dog was around the outside of the car, dog inadvertently sweeps past the car, may have touched a paw to the outside of the car, that was considered not a trespassory search even if it had been a technical trespass because that contact had been made. Your honors, for all the reasons in the government's brief, we would ask this court to affirm the judgment below. Thank you. Thank you. Mr. Irwin, you have two minutes in rebuttal. Thank you. I think I just have two or three brief points. To get back to the questions that Judge Giardini asked me and the government, if the officer can see through, that is a weakness in our argument. I don't want to overstate that, but I would point the court to Giardini's and analogize to Judge Scalia's characterization of the limited license to approach the front door that it's managed by Girl Scouts and trick-or-treaters. I think that the limited license around vehicles is aptly stated in a similar way. I agree. I'm sorry, you've lost me. I don't understand what you're saying. I think that there's a limited license to approach a vehicle, like for example, somebody placing a flyer under a windshield wiper is something that we readily tolerate. Climbing on top of the vehicle and leaning against it is not. Justice Scalia said that in the context of the home, behavior like that would lead someone to call the police. I'm saying that that's unusual conduct that falls outside of that. You're saying a police officer peering into a car exceeds what they're allowed to do? Because if that's your argument, then it seems like that would apply regardless of whether there's tinted other words, even on a sunny day with a car that has no tinted windows, if a police officer goes right up to the driver's window, looks in and sees a gun, you're saying that would exceed the limited license that the officer has? There's no manifestation of privacy in the transparent window, and this is distinct. He didn't look through the side window. He was on top of the car. No, no, no. I'm trying to say, but your limited license argument, are you saying that that means that a police officer can't walk up to a car and look through the window? No, I'm saying those aren't the facts of this case. Is it the tinted window that manifested an expectation of privacy? Yes, it's a tinted window. Let me ask you this, but I thought under the law in Connecticut, there's a limit on the tint and the purpose, the manifest purpose of that is so that police officers cannot be prevented from seeing into the car. So in other words, so people can't be lurking there and shoot the police officer when they come up. I thought the whole point of the limit on tint is so that people can see in. Is that not the purpose of the limit on the tint? I think it is, but there was no... Then why is the tint, the adding of a tint, a manifestation of an expectation of privacy, meaning and manifestation of the expectation that no one can see in? If the whole point of the limitation on tint is so people can see in. Because there was no finding nor contention that the tint was illegal. The videos belie the fact that they... Right, that's what I'm saying. So if it was in legal, if you're saying, let's presume it was within the legal limit and the whole point of the legal limit is to ensure police officers can see in, then I don't see how putting up the legal amount of tint is somehow manifesting an expectation that police won't look in. That's not... I agree with the setup, but that's not what's in the records or the finding in this case. The tint in the parked car with no one in it is tantamount to a curtain. And if somebody had put a curtain in their parked car, it would be a manifestation of privacy outside legal regulation. All right. I'm sorry. I just want to be... Pardon me for belaboring at this point, but it's one I want to be sure I understand your position on. So if the initial look with the cupped hands was constitutionally valid, why isn't that the end of this case? It would be the end of this case, but I agree with the government's characterization of the record, which is clear in the photographs, that the police were leaning against the car. You could only see through the windshield in the record because the body cameras were pressed against the glass of the car. They weren't... If it had to go back to... So if they were an inch further away from touching the car, it would have been okay, but the touching of the car and looking and seeing something that eyes can see gives us a constitutional problem. Where there's an objective manifestation of privacy, yes. If you had put a sun visor... What's the objective manifestation of privacy in the look? In the what? The tenant windows? Correct. But the tenant windows are just to... are not designed to prevent someone from looking in, as Judge Amidi's questions indicate. That's not what's in the record. That's our position. Thank you. All right. Thank you both. We'll reserve decision. Have a good day.